All right, our final case this morning is number 2216465 Jones v. Riot Hospitality Group. Mr. Nathanson, whenever you're ready. Thank you Judge. Good morning. May it please the court. My name is Philip Nathanson. I represent Alyssa Jones. I'm sure the court knows by now I was also the trial counsel in this case. If the court would permit me for a moment or two to put into context how, from the plaintiff's point of view, this case went to a dismissal with prejudice for spoliation of text messages. In January of 2020, there was a hearing on January 31st, to be specific, before the district court on the plaintiff's motion for sanctions that I filed, arguing that the defense had produced no text messages. That their position was we don't have any relevant text messages to produce. At that hearing, the district court granted no relief to the plaintiff. And at the end of the hearing asked, does anyone have anything else to say? Whereupon, trial counsel for the defense said, Your Honor, we don't want to open discovery. Discovery's closed. We don't want any more discovery. But we would like some impeachment evidence. What does that have to do with it, that it's impeachment evidence? You kept saying that in your brief, but what's the relevance of that? I mean, impeachment evidence is evidence. And they wanted the evidence because it had come out at the depositions that there were text messages. No, what came out at the depositions was, Your Honor, where the plaintiff and her female witnesses had talked about their depositions. I thought specifically that there were text messages. They texted each other. Well, there were. So I was ordered to produce messages regarding those conversations, which I did. And you said you would. I did. And you kept delaying it. And eventually you came up with 20 messages, which were apparently not very relevant. I produced the messages regarding conversations about the depositions, whereupon the district court. You didn't produce the messages. You produced very few messages. However many there were, I produced what we had regarding conversations about the depositions, which is what I was asked to do. And then we got to a point in time where the district court said, gee, there seems to be evidence that text messages during two periods of time were deleted. We don't know what they were about on the face of them, but there seems to be evidence that messages were deleted. Correct? The district court said that? Yes, it did. And it then said, in order to get to the bottom of this, I want the parties to agree on a forensic examiner who will look at Ms. Jones's phone and the phones of specified witnesses and determine whether or not stuff was deleted and see whether or not he can figure out what was deleted. Correct? I don't respectfully, Your Honor, think that's correct. Tell me what really happened. What really happened was on March 4th, the district court entered a sua sponte order without notice, without me having an opportunity to respond, stating that my client was required to go fetch the three cell phones from her witnesses and take those three phones and her phone to a vendor. Didn't the judge make some preliminary findings about why he was ordering that? No. Just said, as a whim, just pick up your phones and give them to someone? Well, I don't want to characterize it as a whim, but... Well, you had a pre-trial, you had a conference before that order was issued. No. It was a discovery conference before it was issued. We did not. We had a discovery conference in January. There was no discovery conference in March when he issued it. No communication with the judge between then and the time that he issued the order? None. Zero. The order came over the transom, out of the blue. And somebody asked for something before that? They asked for more messages other than what I produced. And then you responded to that, did you not? I responded to that via email. There was no conference with the judge about issuing... How was this put before the judge? It wasn't put before the judge. There was no motion brought by the defense to produce four cell phones. The defense never made the request. I know, because you've got limited time, I want to ask you two questions, just as background, to make sure I understand it correctly. Sure. You don't object to, I take it, or I didn't see it anywhere in your brief, the judge's finding that messages were deleted from the cell phones of Ms. Jones and two witnesses? The judge found that there were an unknown number of messages... That were deleted? That were... I would re-characterize it as missing. Well, re-characterize it any way you want. Do you object to the judge's finding that those messages were missing? There were some messages apparently missing. An unknown number. Apparently, I mean, sort of months' worth, in the sense that these people texted each other every day for a while, and then after that there was nothing. For a while. Your Honor, my son texts 5,000 times a month. Right, and that's the problem here. I'm amazed at the quantity of texts. All right, so the point is that, yes, they were doing that, and then all of a sudden they weren't doing that. Which is presumably, which was what I understood Judge Snow to have precipitated his order, that there seemed to be missing text messages. No, there was no evidence of missing text messages when Judge Snow issued that order. Whether or not, that's why I'm asking a different question. Leave aside for a moment, we can go through the record and figure out what it shows. What Judge Snow knew or didn't know when he issued the order to produce the phones. I'm now focusing on after the phones were produced, and after Mr. Cook looked at them and issued a report. And again, put aside, you can get back to whether or not you object to his report. At the end of all that, Judge Snow makes some findings. And he says, I find that a bunch of messages were deleted. And so my first question is, or you say are missing, that's fine with me. Is that finding supported by the record? No. So you think there's no evidence in this case that any messages were deleted? Because, Your Honor, the method by which that conclusion was reached by Mr. Kuchta, which Judge Snow accepted, was this comparison of multiple phones. People must have been texting each other. What Mr. Kuchta said was, gee, I have a pair of phones, Ms. Jones and a witness. Right. They're texting each other all the time. And then all of a sudden, it stops. Okay. And they all go buy new phones. And so my conclusion from that, and there's an absence of, even when I have this phone, there's no messages on it during this period. I conclude that messages were intentionally deleted. Can the judge reach that conclusion from that? No. That's a jump based on an assumption. There's nothing there. Some people might call it an inference, right, where this is a finding of fact that the judge is making based on the judge's position. What standard of review should we be applying to the ultimate finding? Let's set aside, I mean, a big part of this case is where it ended, right? And I think that's where Judge Horowitz is going with that and whether the dismissal itself is justified. So what standard of review would you have us apply to the judge's finding that these were intentionally deleted? Thank you, Your Honor. So the standard of review, given the dismissal of prejudice, in the plaintiff's view, should be de novo review because this case involves our production of 51,000 text messages that were used to depose my client twice before we ever landed in that January hearing, which was brought on my – I was expecting you to cite law rather than fact at the end of that statement for the standard of review. What's the case you'd point us to where we wouldn't be deferring to this judge's factual findings of intent? Well, I thought the issue was on the dismissal of prejudice. Let me make it easier for you. I think we have case law that says we review the imposition of Rule 37 sanctions for abuse of discretion by the district court. And let's say we review the district court's underlying factual findings for clear error. Do you agree that's our standard of review? I think we cite that in our brief, Your Honor. Yeah, I think that's your answer to Judge Johnston. We review for abuse of discretion. And we review the underlying findings for clear error. So I'm still trying to figure out why Judge Snow clearly erred in his factual findings. Because the phone from the period that this young woman worked for the defendant was produced, searched, and inquired upon on the merits. That's the phone that related to the period of employment. The phone that came two years later, which is what the phone we're talking about, had nothing to do. Well, it had a great deal to do. It had to do with whether there were, and in fact it turned out there were, there is, there are text messages in the record. And I can't quite tell where they were coming from, which period they're from. Where her colleagues are saying, you know, you were lying the whole time. None of what you say is true. You're just looking for money and so on. Where were those text messages? Were they from this period, the post-January 2020 period? What are you looking at me like that for? I don't understand. I'm not looking at you. I'm trying to remember which text messages. Well, there are a bunch of text messages. There are text messages from her colleagues where they say to her, you know, you made this all up, and so on. Which period of time were they from? Let me give you a specific. They had to be beforehand. Well, let me give you a specific example with the subsequent messages. Mr. Cooke recovered a partial message from Jones to Foster on Watson's phone, but it was not on Jones's phone. Okay. And it was about the case. So, assuming that's true, and I think that's a direct statement from the record, could he then conclude that the absence of any other messages about the case from people who had been communicating in that period must indicate that they were deleted? Well, I think he – She deleted – there's direct evidence that she deleted or that on her phone, to use your term, there was absent at least one message that had been sent to somebody else about the case. Once the judge finds that, can he make a reasonable inference about the absence of other messages? Well, I don't think so, but let's assume that he can. Is that a basis to dismiss this case with prejudice? So that leads to the next question. I mean, because you've been arguing that his finding that there were deleted messages isn't substantiated. But if we assume it was substantiated, then two other questions arise. He also has to find intent in order to come within the section of the rule that allows for dismissal. And the next question is, does he also have to find prejudice, and did he? So let's assume for purposes of this inquiry, which is the legal inquiry and one that really matters in this case, that he properly found that there were deleted messages. Although precisely because they were deleted, he can't find what was in them exactly or how – exactly how many there were or anything like that because they were deleted. So what can he infer from the deletion, if anything, with regard to intent? And if he needs to, does he need to prejudice? Your Honor, if I just may clarify what you said for one second. In 2018, I sent the applicable phone, the iPhone. Different phone. I understand. We're not talking about that phone. The red phone. We're not talking about those messages. I sent it to a vendor. I understand that. We're not talking about that phone or those messages. They did quantify the deletions. We're not talking about that phone or those messages. We're talking about the messages that were – that dealt with what these people were saying to each other, if anything, at the time of the depositions and before and afterwards, which you characterize as being for cross-examination. But, yes, which go to whether they were essentially concocting a defense or whether some of them were refusing to participate in concocting a defense or what. I mean, not a defense. I mean, the plaintiff's case. So forget about the earlier ones and assume that these – there was a deletion of the set of – on the phones that were, in fact, sent to the forensic examiner that was agreed upon. What do we do if we – how, in general, in applying this relatively new rule, does a court go around deciding whether – and how do we go about reviewing whether this was an intentional deletion that would support – that could support a dismissal under the rule? And whether – and do we also have to – did he also have to find prejudice? And how do we review that if he did? Well, the Eighth Circuit case cited by the defense in their brief said they have to show that the messages that were deleted were new and different than the ones that had been previously produced and in order to show prejudice. And obviously – Well, there's something in the – there's some – something in the advisory notes to the rule that says you don't have to show prejudice. But it seems to me, in some circumstances, with regard to the dismissal order, you would think you did have to show prejudice. But that's a question. It's a legal question about do you have to show prejudice if there was intentional deletion? Well – Or is it just a fraud in the court whether there was prejudice or not? Rule 37E1 says upon the finding of prejudice to another party – Yeah, but this isn't E1. This is E2. It then says or. And then – Okay, or? And I think this is where Judge Berzon is looking at. We're trying to – there's that legal question of set aside whether the judge could find it. Is – where would a prejudice requirement come from on Rule 37? Well, I think it would come from the other cases that we cite in our brief, which – The Anheuser-Busch test or those other – or do you think those cases, those elements still exist for purposes of the dismissal notwithstanding the new rule? We cite several Ninth Circuit cases in our brief. Right, but we don't have a lot of cases, I think as Judge Berzon said, that are applying the rule, which doesn't quite read the way that our cases once read. Okay. To put it differently, there's a whole set of case law about dismissal as a sanction under Rule 37. And then there's – then we have this new Rule 37E2, which comes in. And the question is do we apply that old case law to determine whether dismissal with prejudice was required or is there a different standard under E2? I think the standard from the plaintiff's point of view should be, and we cite this in our brief, did whatever deletion that occurred prevent the defense from prosecuting – from defending the case or defending themselves at trial? The problem, of course, is that since they were deleted and we don't have them, it's very hard to say. Mr. Nathan, does it matter at all? Well, I think you suggest it does, and I'd like to just push a little bit on why, that the missing messages occur after the close of discovery in this case. And I guess the preliminary question is I couldn't find in the record when discovery closed. I don't think it's disputed that these hearings happened after the end of discovery. But why would that matter if the judge's concern is that these are post-hoc efforts to manufacture the plaintiff's claim? Why does it matter that it happened after the close of discovery, that it happened for impeachment or for whatever reason? Why would that timing matter to prejudice? I think there's a couple reasons. Because during the entire discovery period, the defense never said that there's a problem with missing messages, even though they knew since 2018, when I produced our expert IT report, that there had been 51 deletions on the first cell phone. They never, ever took the position up to the close of discovery that that was a problem. They took all kinds of depositions, two of my client. Well, maybe because they thought at that point they would have a hard time showing prejudice because a lot of the material that was produced was fairly damning anyway. But now they have a different thing they're trying to show, which is they're trying to deal with the other witnesses and demonstrate, essentially, that there was collusion or corruption or something among them. And that's a different problem as to which the deletion would have a different impact. And also that it could have been and turned out to be perhaps a much greater deletion. There was nothing said at the hearing. When counsel said we need impeachment evidence, he didn't say because there's missing messages. He said these women were having conversations about their depositions. Well, he didn't say it until it appeared that you weren't going to give him messages, that he wasn't getting the messages from the other witnesses or from you. I say as an officer of this court, I produced not only the original 51,000 messages, but every message that we had regarding conversations about their depositions. That was still on their phones. That was the problem that was left on their phones. You produced what was left on their phones. You didn't produce evidence as to whether there were other messages that were no longer on their phones. Well, I didn't know at that point that there were other messages. I don't think anybody's necessarily blaming you. They weren't on the phones, but when the judge entered his March 4th order, he doesn't say in there that because there's evidence of missing messages, I'm going to have these phones examined. Well, we now know that, as you just said, that there was evidence of missing messages from the earlier period. An unknown number of missing messages. I think the defense says in their brief at least one, if I'm not mistaken. Mr. Nathanson, are there any other points you want to cover? We'll give you a couple of minutes on rebuttal otherwise. Thank you, Judge. Thank you. Thank you. Mr. Nakamura. Good morning, Your Honors. Richard Nakamura on behalf of Appalese. I'm joined at council table by trial counsel Sean Carroll. I'd like to start where my colleague began, which is at the January 11th, excuse me, January 10th hearing on the motion for sanctions. And he told this court that we represented to Judge Snow at the time that we had no relevant evidence to produce. I strenuously refute that, and I would like to direct the court's attention to these portions of the record. Can we start by trying to pin down when did discovery close? Sure. By the terms of the original CMO, which is in the record, the discovery cutoff was October 25th, 2019. That's an SER-414. That deadline was subsequently extended by Judge Snow to December 31, 2019. And Your Honors can find that extended deadline at docket, excuse me, in the reporter's transcript of 11-5-19 at pages 63, lines 5 through 6. All right. Thank you. With that setting the table. I've made a note to myself to answer that question because I heard you ask that of Mr. Nathanson. So getting back to my refutation of what counsel said, we said at the January 10th hearing, he said we had no evidence to produce. Well, by that time, there were a couple of things. Number one, the ESI stipulation, which is in the record, had already expressly said, quote, defendants have already produced their ESI. Now, that ESI stip was from March 11, 2019. Point number two, to refute what counsel said. In opposing his motion for sanctions against us, we attached evidence of supplemental ESI that we gave to the plaintiffs regarding emails and texts from Mr. Hibbert, Sanchez, and others. And your honors can find what we attached. Okay. But did you raise, that's sort of peripheral to what we're dealing with now. Did you raise the, you said you wanted messages relating to what was referred to at the depositions by the witnesses. Did you suggest at that point that there had been deletions? We knew there were deletions on Jones's phone. 51 deletions early. Right. But you didn't move for any sanctions about that. No, no. And I'm assuming that's because. Partly because the production from ALTEP took place over the course of several months. We got ALTEP's production between April and August of 2019. Now, it's not until July of 2019 when Jones tells us in a disclosure that Foster Myers and witnesses will be her key witnesses. And we talk about that at page 22 of our brief in the record at SCR 160-161. Help us understand how we got from the hearing in front of Judge Snow. Which hearing, your honor? January 11th. To the order to turn over. Tell me what happened. Did something happen at that hearing to push the order or did something happen in between? Tell us what happened. There is so much that happened between January. I don't want to know the facts that happened. I want to know what happened in court. Okay. So, on January 10th, a representation is made by plaintiff's counsel that production will be made on January 17th. Of these. From Jones's phone. Not the other people. Correct. From Jones's phone. With regard to the post. What period are we talking about that there was supposed to be production about? It's not clear from the record what period we're talking about. The transcript just has Mr. Nathanson saying he will make the production from Jones's phone. What was he asked for? I'm sorry? What was he asked for? The relevant, non-privileged documents from Jones's phone. And did you identify a specific phone or did you say from her phone? I don't think we identified a specific phone. He already produced, he says, 50,000 messages for some time period. So, were you talking about the entire period thereafter or some subset of that or we don't know? Well, the 50,000 is limited to pre-July 2018. I understand that. So, are you asking for anything after July 2019 or 19 or whatever it was? What is it he's supposed to be producing at that point? He is supposed to be producing the messages from whatever he had that was relevant to the claims that Jones was making against Archive in this case. So, you had gotten at some point the stuff from the imaging vendor? I'm sorry? You had gotten at some point the stuff from the imaging vendor? We did. When was that? We received from Digital Acuity. We received from Digital Acuity the non-privileged, relevant data from the four phones. When did you get that in response to your? Because what I understand Mr. Nathanson said is, look, we got a request for production.  We did not get the material from the four phones until March 4th, 2021. And that was after the district court, after a series of events that transpired after the January hearing. Okay, so you continued to get stuff from the vendor? No, we got nothing until March 4th, 2021 directly from Digital Acuity. No, now you're talking about Mr. Cook. Or Mr. Cook. I'm sorry, we're missing each other here. At some point, as I understand this record, Ms. Jones' phone was sent to a vendor. Her vendor. Her vendor. That's right. I agree. Her vendor was sent to her vendor because she would ask for images from the phone and the vendor produced something. Right. When did you get that? Okay. Because my understanding was it was that and the depositions that suggested together something was missing. Well, okay. I thought you got all that. I thought you said earlier you got all that, like around July and August. Yeah, that's what I thought too. So I'm trying to figure out, and it may not be relevant to this case, but I'm just trying to figure out, I thought I understood the timeline until Mr. Nathanson got up, and I must admit, you're not confusing me too. So let me just ask a very specific question. A judge issued an order at some point to say turn the phones over to Mr. Cook. We want you to stipulate to a third-party vendor and turn the phones over to him. I want to know what happened in court. In court, not between you and Mr. Nathanson, between January 11th and that order that gave rise to that order. Was there a motion? Was there a status conference? Was there a hearing? Again, I'm not sure this makes any difference to the ultimate outcome, but just you were both there. Just tell me. I've been looking for the record trying to figure out what happened in that interim. Tell me what happened. Not in terms of who did what with each other. I understand. So if I'm understanding your question correctly, you want to know when we received the production from Alton. No, no. I'm not going to make it easy. But the ultimate question is what was Judge Snow reacting to? Yes. The concern here is that this is a, you know, at some point it's a dismissal of the case, and they didn't see these kind of cumulative issues coming up. So what was the trigger that led this case down the path to dismissal with prejudice? Was it you? Was it the judge? Mr. Nathanson says, gee, I went to a January 11th hearing. There was no order there about producing phones. And then I get an order in March. Okay. And it says produce the phones. So what happened in between? In November of 2020, November 16 of 2020, Judge Snow gives Jones, Watson, and Myers until December 11th, December 11th of 2020 to produce the documents. But those are the documents that result from Mr. Cook does review. Correct. I understand that. And this may make no difference in the end. But you're answering a different question than the one I'm asking. At some point, Judge Snow issues an order, his initial order that says, I want you guys to agree on a third-party forensic expert and deliver the phones to him. Actually, he says deliver Ms. Jones' phone, but then the other two, others are subpoenaed,  Okay. Tell me what happened between either at the January hearing or before that order was issued that led Judge Snow to issue that order. Well, we get the production from ALTAP on November 15th, 2019. That's when you got it, which was now after the close of discovery. After the close of discovery. It was late, but it was related to that discovery. Right. And those spreadsheets were given to us. Those were the spreadsheets that showed the deletion. 51 deletions. Text messages. And 50,000 productions and 51 deletions. Is that basically accurate? I'm not sure. Well, many, many, many productions. And now you have depositions, what, in December? Correct. We have the depositions of the three witnesses in November and December of 2019. Okay. And the documents that they were ordered to produce were what, the text messages? What were the documents? They were ordered to produce their phones to the specialists. That was until March. I'm sorry. Are we talking about the witnesses? I mean, the importance of all this, and we're not even getting to the rest of the issues in the case, is that there's certainly a fair amount of case law, and it's also just logical, that you don't make people produce their private cell phones without a damn good reason. All right. So what was the reason? The reason was that there was extensive evidence that Jones had been deleting communications. Well, the evidence was that it's this evidence from November that there were 51 deletions. That's, did Judge Snow say that was the reason? He didn't order them in January to do that, and he already knew about the 51 deletions. That's true. So what led to the order? What led to the order was the continuing violation of his orders to produce the phones or to release the data. Okay. So when did he enter those orders? Okay. Now, don't tell me about the ones later that dealt with the information from Cocteau. Tell me about orders. No, I'm just trying to figure out, and this may not be dispositive in any way. I understand your point. But your friend says, gee, we got blindsided. We went to a hearing in January, and all of a sudden we got this order, and we never had a chance to talk about it. I'm not sure it makes a difference. But I'm trying to figure out what happened between January and the initial order, not in terms of what you got or what he got, but what Judge Snow was told. Between January of 2020 and the March 4, 2020 order. Yes. Did somebody go to Judge Snow and say, please order them to turn them over? Did you go to Judge Snow and say, we're not getting the production we required? I mean, what happened? Or did he just, as he may have been entitled to, look at the record and say, gee, I see a problem here, and I'm going to issue an order. I just, I'm missing that interim period. Tell me what happened. Well, on January 18th of 2020, we received from Plaintiff's Counsel the unusable, unsearchable PDF production that is not compliant with. . . Okay, did you make Judge Snow aware of that? Eventually, yes, we did. How did you do that? That was the January 31st hearing. Correct. So what happened between the January 31st hearing, there was an extension, the court denied a request for more time, Jones produced a 12-page PDF with more text messages. After the January 31st hearing, we reported to the District Court in February, February 21st of 2020, what I just described earlier. And was that the trigger of the March 4th order, or what was the approximate cause of the March 4th order from the court? What did you report? Okay, on February 28th, so we're less than a week out of March 4th, the parties submitted position statements to the District Court outlining where Discovery stood at that time, and those position statements are in the record, and it was based on that that the court conducted that hearing on March 4th. So there was a hearing on March 4th? I thought he says there wasn't a hearing on March 4th. Well, it was a telephonic hearing. It was telephonic. Okay, but there was a communication, so when he says it came out of the blue, he's wrong. Respectfully, yes. Okay, so I don't want us to stay on this chronology. Maybe just for the next three seconds. But there is, in fact, a threshold question of whether or not this was justified, and it took this long to get to the point in knowing that there was some interchange that led Judge Snow to do this. And I apologize for not fully understanding the question, but once I got the parameters of the time down. And what did you tell Judge Snow that would have led him to do this? What did we? I'm sorry? What did you tell Judge Snow that would have led him to do this? What we told him in our discovery position statements. That you'd gotten unusable discovery. Well, it wasn't just that. You made the judge aware of the nature of the responses to your discovery requests. Correct. In the period between January and March. He held a telephonic conference in March, and as a result of that conference he issued an order, since you and the other side had opposite positions about the status of discovery, for the phones to be turned over to third-party vendors. Right, so to move on. So let's move on. Oh, my goodness. What I'm interested in is how we apply this rule in the sense that, I mean, what's difficult about it is that, obviously, if you don't have the messages. I'm not even talking about the inference that there were deletions, and we can assume that it's a fair inference for this purpose. How does one decide whether they were intentional? And how does one decide, and does one need to decide whether there's prejudice, and how do you do that? Well, Judge Berzin, you were correct about what the advisory committee notes say about prejudice. I know I was correct. I wouldn't have said it if I didn't know the answer. Go ahead. Okay, so prejudice can be inferred if there's a finding of intent. But does prejudice need to be found? According to the plain language of 37E2, I believe the answer is yes. No, it's not an E2. Hold on, hold on. Well, E2 doesn't require prejudice on its face. It says upon finding prejudice. That's one. Yes, right. And then E2 requires the intent. Right, and then there's the or between the two. So there's no requirement in the rule for prejudice. Correct. But where would any—so what's your position on whether prejudice is required? And if it were, what is it? Well, Judge Snow, if it's required, and I'm not sure it is because it wasn't briefed, if it is required, Judge Snow found prejudice. Okay, but all he knows is that how do you find prejudice from what's not there? When the scope of the what's not there is as massive as what this record show, I think a reasonable inference of prejudice— Why can't—why wouldn't it be, to the extent the rules require it anymore, notwithstanding our cases, why wouldn't you leave that to the jury, just provide an adverse inference instruction? Why is that narrower sanction not sufficient? Because these deleted messages all went to credibility. And what lesser sanction would remedy our client's inability to test the truthfulness of the witnesses as they're telling their stories on the stand? Oh, you hired— So what kind of jury instruction would Judge Snow give that would say to the jury, believe but don't believe the witnesses? You hired the— It doesn't work. I didn't believe your client hired the expert here. Put him on the stand and say, no, there's all these texts are missing. Make what you will of it. So that's not sufficient. Dismissal with prejudice is required by the rules. It's— Or permitted. Remember your standard, Your Honor. It's not whether dismissal was required. The standard of review here is whether you are left with a clear and firm conviction that a clear error has been made. The district court's choice of the sanction— But this is a dismissal of a lawsuit. I'm sorry. Well, I was just saying that this is a dismissal of a lawsuit. You'd think that it should have a pretty high threshold. Very high threshold. A very high threshold. And Judge Snow exercised the patience of Job in working with the parties for years to resolve this discovery dispute. Judge Snow made some findings about why lesser sanctions would not be— He most certainly did. How do we review those findings? Abuse of discretion. Well, the factual basis for clear error and his findings as to the inefficacy, if you will, of lesser sanctions, abuse of discretion. And the part about inferring prejudice, you have to not only have intentional conduct to infer prejudice, you have to make some finding that the materials spoliated, if that's a verb, were likely relevant to the case. Do you not? Correct. And he made those findings too. Correct. So it's just not that he assumed prejudice from what he found to be intentional conduct. He had a basis for finding that the materials not there likely had to do with the case. Correct. Correct. Mr. Nakamura. If I may just— Yes. 20 seconds. I just want to put this case in a broader context. We're not fighting this tooth and nail because we think there's a technical reading of the law that gets us off the hook. We're fighting this because as a result of spoliation that took place over the course of years, my client has been deprived of the opportunity to present its best defense. And that defense is that this lawsuit is based on fiction, not fact. When I was referring to some texts that are in the record, I don't know from what time period, which seemed to support that conclusion. Why weren't those good enough? Why weren't what good enough? The texts that— The texts? The texts that I was referring to before where her colleagues were saying— Oh, you're talking about the Foster screenshot. No, I'm talking about some texts that I don't know what time period they're from where the witnesses say, you know, you made all this up, you're a liar, you're trying to get money and all that. What are those from? I mean, there were several of those. Right. What period are those from? I don't remember. My understanding was they didn't come from the witness but from her boyfriend. Is that right? No, some of them came from the witnesses. I'm sure they did. It probably came from both. Right. But as we say in our brief, this dismissal was not based on what was found. This dismissal was based on what was not. I know, but in terms of prejudice, if you already have plenty of evidence that she made it all up, why do you need more? But who is to be the final arbiter of plenty? I mean, as matters, as the truth came out, truth being the extent of the spoliation, the universe of plenty was huge. Well, but you could go to the jury with the evidence that she made it up from these text messages you do have and with the deletion. So, I mean, it's really a question of how high the threshold ought to be for a dismissal. But why were you, what chance was there that the jury wasn't going to find that the story was made up? We don't know, but we should not be left in a position of having to defend ourselves without the full panoply of the text messages to test whether or not this lawsuit is fact or fiction. And that's really all I have to say. Thank you very much, Mr. Nakamura. Thank you. Mr. Nathanson, two minutes. Your Honor, if I may make two quick points. First, at the same January 31st hearing, Judge Snow said to me, it seems to me they're not going to win on summary judgment to the extent they're going to argue this practice didn't occur because it looks to me like you've got pretty good evidence that at least with respect to your client, it did. So, this business about a frivolous case… All he said was, you have evidence that will get you past summary judgment. He didn't say it wasn't manufactured evidence or that it was credible evidence. He was just saying, it looks to me like this is not a summary judgment case because you have witnesses and your client who said that this happened. He wasn't making a determination of the strength of the case. I understand your point, Your Honor, but prior to that January 31st hearing, all these depositions and documents had been produced to Judge Snow. And he said he reviewed it all. Now, I have one last point, if the Court will permit me. At pages 14 and 15 of the defense brief, they say what is true, that the district court ordered production of the non-privileged extracted data directly to RHG, Riot Hospitality. Which means, at the end of this whole process with Mr. Kuchta, he had created these voluminous spreadsheets of the entire contents of every phone Judge Snow gave those spreadsheets to the defense. I'm not talking about just text messages. I'm talking about conversations with their children, with their husbands, with their employers. The entirety of the contents, inventory contents of all of... Wasn't that because you were asked to make privileged determinations or requests and you didn't? Well, respectfully, Your Honor, I don't remember that, but my point... There's an order from Judge Snow that says here's how this is going to work. Kuchta's going to look at this stuff. He's then going to send stuff that meets search terms that you'd stipulated to, to Mr. Nathanson. And Mr. Nathanson can then make up a privilege log out of that and give the stuff that's relevant to the other side. And what bothered Judge Snow, I think, a lot was that you never did that, despite getting multiple extensions and orders to do so. I never got the documents. I got spreadsheets. And what's wrong with spreadsheets? What's wrong with spreadsheets? It's not a text message. The spreadsheets had... But it included the text message. They did.  They did. So what's the problem? I don't get it. I mean, you had the text messages on a spreadsheet. You wanted them not on a spreadsheet. The spreadsheets had all kinds of personal information. And that's what Judge Snow said. You can, in effect, redact these in the order. I'm sending them to you first because I don't want them to go directly to the other side. There may be a lot of irrelevant stuff. There may be privilege stuff. So, Mr. Nathanson, you can look at this stuff, make up a log of what you're not sending on to Mr. Nakamura, and then send on the rest to him. And you never did. I asked for PDF documents to produce of text messages. Okay, but, I mean... And I was told I would get them by Mr. Kuchta. But that's an incredibly, you know, technical response. You have the messages. You can claim privilege as to message, you know, on a spreadsheet this line, on a spreadsheet that line, and you don't do it. What difference does it make if it's a separate document? I was baffled by that. Because I interpreted Judge Snow's orders to mean I had to produce documents containing text messages, not the inventory of all the cell phones, which is what they ended up with. So, my only point on this is, if the issue is prejudice, they got the entirety of all these cell phones. So, where's the prejudice? Well, the prejudice is that there was stuff on there that wasn't there. Okay. Well, thank you, Mr. Nathanson. Thank you. Case is submitted. We'll be in recess for today.
judges: BERZON, HURWITZ, JOHNSTONE